## FRANK TURNER v. STATE.

No. A-404.   Opinion Filed November 21, 1910.

1.    **APPEAL AND ERROR—Change of Venue—Discretion of Court.**
The application for a change of venue in a criminal cause is
addressed to the sound discretion of the court, and the Criminal
Court of Appeals will not reverse the ruling of the trial court
denying an application for a change of venue, unless it is made
to appear that there has been such an abuse of discretion as
to constitute a denial of a substantial right.

2.    **VENUE—Application for Change—Hearing.** When counter affi-
davits are introduced "to show that the persons making af-
fidavits in support of the application for a change of venue are
not credible persons and that the change is not necessary," it
then becomes a question of fact for the court to determine
whether the defendant's supporting affiants are credible persons
within the requirement of [the statute.

3.    **SAME—Affidavits of "Credible Persons."** Where persons making
affidavits in support of an application for a change of venue
for the reason "that the minds of the inhabitants of the county
in which the cause is pending are so prejudiced against the
defendant that a fair and impartial trial can not be had there-
in," are examined in open court in regard to the truth of said
application and their examination shows their means of knowl-
edge was not sufficient to support, sustain or justify the state-
ments made in their supporting affidavits, said supporting af-
fiants were not credible persons within the statute requiring
the application of a defendant for a change of venue to be sup-
ported by the affidavits of at least three credible persons.

4.    **JURY—Challenge for Cause—Opinion of Guilt.** A mere impres-
sion not amounting to an opinion, derived from newspaper re-
ports or rumor does not disqualify a juror, and is not sufficient
cause for challenge. It must appear that he has formed a fixed
opinion.

5.    **SAME—Mere Impressions.** A juror who states on his examina-
tion on the voir dire that he has an impression, not amounting
to an opinion, from the reading of a newspaper account of the
tragedy, and that his impression did not amount to an opinion,
and was not such as would in any way influence his verdict,
is competent, and a challenge for cause by reason of implied
bias was properly overruled.

6.    **SAME—"Impartial Jury"—Constitutional Guaranty.** The statute
which provides (sec. 6814, Snyder's) that: "No person shall
be disqualified as a juror by reason of having formed or ex-

pressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him," is not in violation of the constitutional guaranty of the right to a trial by an impartial jury. (Sec. 20, Bill of Rights.)

7. SAME—Force of Statutory Provisions. The statute can not in any degree change the essential qualifications which jurors must possess, it merely furnishes a test by which those qualifications are to be determined and makes the statement of a juror, "that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him," competent, as bearing upon the question of his impartiality, and requires the court to consider such statement, when so made. The result is to make the competency of a juror as affected by his opinion based upon newspaper reports or rumor a question of fact for the court to determine.

8. SAME—Fixed Opinions—Force of Juror's Statements. The statute does not attempt to determine in the least what shall be the probative force of the statement of the juror when so made, or how far it shall have the effect of relieving him of the disqualification arising from his opinion, and when the opinion of the juror is only slight or transient, or is hypothetical, his statement under oath, that notwithstanding such opinion, he will act impartially and fairly as a juror, is one of the most satisfactory tests of his impartiality, but where it is clearly shown that the juror has a fixed opinion as to the merits of the case, or as to the guilt or innocence of the defendant, such statement then has little if any tendency to establish his impartiality, as it does not tend to show the nonexistence of the fixed and positive opinion which he admits he has formed or expressed.

9. SAME—Case. A juror who states on his examination on the voir dire that he has formed an opinion as to the guilt of the defendant based upon a newspaper account of the tragedy which purported to be the statement of an eyewitness well known to said juror, and whose name was indorsed upon the indictment, said statement being substantially the evidence expected to be presented by the prosecution on the trial, is incompetent, and on a challenge for cause should be rejected, even though he states on cross-examination that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him, and that he will render an impartial verdict upon the law and the evidence.

10. SAME—Refusal of Challenge for Cause—Harmless Error. When a juror who should have been rejected, for cause, is afterwards peremptorily challenged and a full panel of impartial and acceptable jurors is obtained before the defendant has exhausted

all his peremptory challenges, the error does not prejudice him and is harmless and is no ground for reversal.

11.    HOMICIDE—Self-Defense — Question for Jury. Whether the appearances were sufficient to cause a reasonable apprehens'on that death or great bodily harm was intended is a question for the jury.

12.    SAME—Instructions. See opinion for instructions held to be correct and complete in application to the facts of the case.

(Syllabus by the Court.)

*Appeal from District Court, Carter County; S. H. Russell, Judge.*

Frank Turner was convicted of murder and sentenced to imprisonment for life at hard labor, and he appeals. Affirmed.

Plaintiff in error (hereinafter designated the defendant) was on the 12th day of November, 1908, indicted in the District Court of Carter County. The indictment charged that on the 19th day of September, 1908, in said county and state, the defendant did kill and murder one Charles McCumber by shooting him with a shotgun.

Upon his trial, the jury returned a verdict of guilty of murder and designated as his punishment imprisonment for life at hard labor.

Motions for a new trial and in arrest of judgment having been overruled, on January 2, 1909, the court pronounced judgment in accordance with the verdict. From which judgment the defendant appealed by filing in this court November 1, 1909, his petition in error with case-made attached.

The material facts in the case as disclosed by the record may be briefly stated as follows:

It appears that the defendant and McCumber at the time of the tragedy resided about ten miles northwest of Ardmore on adjoining farms. For sometime prior to the killing there had been trouble between them concerning the killing of a cow belonging to McCumber, on the defendant's farm. On the morning of the 19th day of September, 1908, McCumber went to Ardmore with a Mr. Carter and his son, his neighbors. The defendant was in

Ardmore on that day, and meeting McCumber an altercation arose over the killing of the cow. McCumber left Ardmore late in the afternoon for his home with the Carters in their farm wagon, and passing near the home of the defendant about dusk, where the roadside was covered with a dense thicket, McCumber standing in the front end of the wagon, without a word of warning, was shot by the defendant with a shotgun, killing him almost instantly.

The theory of the prosecution is that the defendant, following the altercation in the town of Ardmore, proceeded home and armed himself with the shotgun and, lying in wait near the wayside, deliberately assassinated McCumber for revenge. That the defendant killed Charles McCumber by shooting him is not denied, the only defense interposed was that the defendant believed that the deceased was about to attack him, and that he killed him in defense of himself.

The state called as a witness one Claude Bumper, who testified that his home was a half mile east of Richardson's; that at the time of the homicide the defendant lived with the Richardsons, who were tenants on the defendant's farm; that the deceased lived about three hundred yards west and that the Carters lived one-half mile west of Richardson's. Witness was then staying with the Carters; that on that day he was in Ardmore and left about three o'clock for Carter's, arriving there a little before sun down; that he then went to his home on horse-back and turned his calves out, and starting back to Carter's he met the defendant carrying a Winchester shotgun on his shoulder; that he asked the defendant where he was going, and he answered that he was going to Mr. Donham's, who lived about a mile east. That fifteen or twenty minutes later, as he was unsaddling his horse at Carter's he heard a shot in the direction of Richardson's; that the sun had just about set at that time. He further testified that the road east from Richardson's to his house passed through a dense thicket, and was only wide enough for a wagon to pass through, and that east from his house it was open prairie.

Also J. E. Carter, who testified that he lived ten miles north-

west of Ardmore; that on the day of the homicide, he and his son drove to Ardmore with a load of corn; that Charles McCumber rode to town with them, and that he rode back with them; that as they approached the house where the defendant lived Mr. McCumber was standing in the front end of the wagon, on the left hand side, and witness was standing on the right hand side driving, and his son was behind them; that when they were about opposite defendant's house the horses shied to the right; that he noticed an object on the left hand side of the road; and about the time they got even with this object, Frank Turner, the defendant, stepped out toward the wagon, and a gun was fired and McCumber just grabbed himself and says "Oh," reeled and fell backwards in the wagon dead. Witness further testified as follows: "The horses became frightened and run some twenty or twenty-five steps before I checked them. I heard the defendant reload his gun and I turned and said, 'Frank, don't shoot me.' The defendant answered, 'I ought to kill' or 'I don't care if I kill the whole bunch.' I drove on to McCumber's house, and left my wagon there in the door yard." He further testified that Richardson's house, where the defendant lived, was on the right hand side of the road and the deceased was looking toward the house, and had just made the remark "That there wasn't any light over there," when he was shot. That the deceased was dressed in pants and shirt, without a coat and was unarmed.

The testimony of Geo. Carter was in substance the same as his father's. He further testified that he was standing behind McCumber and his father in the wagon: that McCumber was looking to the right towards the house where defendant lived when the defendant stepped from the left side of the road towards the front wheels of the wagon, and, holding the muzzle of the gun within two or three feet of McCumber, without a word shot him.

Smith Redmond testified that he was a policeman in the city of Ardmore; that on the Saturday that McCumber was killed he had a talk with the defendant in Ardmore; that the defendant asked him if he had heard how McCumber treated him, and said

that he had met him up there on the street and slapped his jaws and abused him considerable. He said that McCumber ought not to have done him in any such way as that; that of course he could not fight him, but "McCumber did not know him very well or he would not have done it. He said that it would turn out about like Mr. King's case," and then asked witness to meet a man and his wife that was coming on the Frisco that evening, and tell them that he had to go home. He said he had to go out home right away, and could not wait for them; that they would have to get some other way to come out; that this conversation was had about four o'clock, p. m.

L. F. Barefield testified that he was called, with several other neighbors, to go to the home of the deceased and found the body of the deceased in a farm wagon in the yard there; that on the body of the deceased they found a shotgun wound about an inch and a quarter back of the left nipple; that the wound was near the size of a silver dollar; that they found a couple of shotgun wads near the edge of the wound, and there were powder burns under the arm of the deceased and several shot had passed through the body, coming out above the breast bone; that the deceased was dressed in a vest, thin shirt, and trousers. In the pockets was a pocket knife, a pipe and some change.

On the part of the defendant, W. E. Richardson and J. H. Richardson, his son, testified that at the time of the homicide the defendant was living with them; and that the deceased had several times threatened to kill the defendant if he did not pay him for his cow that he had killed.

Several other witnesses testified they had heard deceased threaten to slap and to kill the defendant.

The defendant, as a witness in his own behalf, testified that W. E. Richardson told him that the deceased said, "I was the man that killed his cows and he was going to kill me"; that "on the day of the killing I came to town to meet a Mr. Richardson and his wife that was coming on the train in the afternoon; that meeting the deceased on the street he said to me, 'You God damn

son of a bitch, you killed my cow, and if you don't pay me for it right here, I am going to stomp you through this pavement', and I tried to get away from him. He ran up like he was going to hit me and grabbed at my nose, and I pushed him and said 'leave me alone'; and he said, 'You son of a bitch, I will kill you before night.'" That after that he met him again on Main street, and the deceased slapped him and repeated his threats to kill him; that several persons told him that old man McCumber was threatening to kill him; that he started for home and reached there a half hour by sun, or some such matter; that the shooting occurred between sundown and dark; that "There was some disturbance down where the chickens roosted across the road in a patch of timber on that side of the road, and I took my gun and went down there." The record further shows his testimony as follows:

"Q. Now, describe to the jury, in your own way, how you came up with this wagon and what was done there? A. Well, there is a sort of a road runs out through the pasture there into that timber, I had been down there east of that road a little ways, looking to see what was after the chickens. I was coming back up that way, and just about the time I was coming into the other road, why, this wagon came along, just passing, and I walked on thinking the wagon would pass by the time I got to the road. I turned out of the road a little piece to get by the wagon, and about the time I got somewheres along the west side, or about the front of the wagon, this man says, 'There's the God damn son of a bitch now,' and made a pass like he was going to get out of the wagon, and jumped right out towards me, and when he made that pass, I just threw the gun up that way, didn't take aim or put it to my shoulder or nothing, because I didn't want him to get onto me, or get hold of me, and I didn't know whether he had something to shoot with or what he was doing."

W. H. Mason, a witness for the state, in rebuttal testified that he was present when the defendant and deceased had an altercation in Ardmore on the day of the homicide; that the deceased did not at that time threaten to kill the defendant.

J. A. Massey testified that he was present during the altercation between defendant and the deceased on the day of the homi-

cide; that he did not hear McCumber threaten to kill the defendant, but he did hear him say: "Frank, the only way I am afraid of you is you will shoot me or cut me in the back, or in the dark."

There are other circumstances appearing from the evidence introduced tending to strengthen the theory of the prosecution, which we will not state.

The case was orally argued and submitted on briefs at the March, 1910, term of this court.

*Cruce, Cruce & Bleakmore, J. B. Champion,* and *R. F. Turner,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, JUDGE (after stating the facts as above). Numerous errors are alleged in the petition, and the case has been ably and elaborately argued in this court, and if the reasons given for our decision are not as elaborate as the arguments, it is not because we have not given that careful consideration to the questions raised that their gravity and importance demands.

When the case was called for trial the defendant made application for a change of venue, on the ground:

"That the minds of the inhabitants of Carter County are so prejudiced against him that a fair and impartial trial can not be had therein."

This was verified by the defendant's affidavit, and was supported by the affidavits of Ed Walling, R. E. Roberts, C. M. Grant, R. E. Brown, W. H. Rodgers, J. W. Bennett and G. B. Holt. The application was controverted by the state on the affidavit of Jas. H. Mathers, county attorney, wherein he says:

"I was not served with notice of application for a change of venue until four-thirty, p. m., December 9th, and did not see the motion or a list of the compurgators until this December 10th, 1908."

And the counter affidavits of nine persons, wherein affiants state:

"That they are residents of Carter County and acquainted

with the persons who made affidavit in support of the defendant's application for a change of venue, and that they believe that said affiants are not reliably and rightly informed as to the condition of mind of the citizens generally of Carter County in their feelings towards the defendant Frank Turner, and that they further believe that said defendant can obtain a fair and impartial trial in Carter County, and that an unbiased and unprejudiced jury can be obtained in Carter County to try the case."

On the issue thus joined the state called as witnesses each of the defendant's supporting affiants. The state also introduced the testimony of twelve witnesses as counter evidence of the truth of the application to show that a change of venue was not necessary to secure to the defendant a fair and impartial trial. Most of these witnesses had lived in Carter County for many years and had a wide acquaintance there. The court after hearing the testimony overruled the application. The defendant objected to the introduction of the counter affidavits, on the ground that they did not conform to the requirement of the statute, in that said affiants did not state that the defendant's supporting affiants are not credible persons. Counsel for the defendant contend that the court erred in holding the counter affidavits sufficient and in permitting witnesses other than the defendant's supporting affiants to testify on the hearing had upon the application.

The application for change of venue in a criminal cause is addressed to the sound discretion of the court, and this court will not reverse the ruling of the trial court denying an application for a change of venue unless it is made to appear that there has been such an abuse of discretion as to constitute a denial of a substantial right. When counter affidavits are introduced "to show that the persons making affiadavits in support of the application for a change of venue are not credible persons and that the change is not necessary," it then becomes a question of fact for the court to determine upon a hearing whether the defendant's supporting affiants are credible persons within the requirement of the statute, and whether a change of venue is necessary to secure the defendant a fair and impartial trial. The counter affidavits were properly

admitted, and the taking of testimony in support thereof was a matter within the sound discretion of the court. The examination of defendant's supporting affiants shows their means of knowing the conditions of the minds of the people of Carter County was very meager, their memory poor as to whom they had talked with or heard say that the defendant could not obtain a fair and impartial trial in Carter County, and shows their means of knowledge was not sufficient to support, sustain or justify the statements contained in their affidavits. Where persons making affidavits in support of an application for a change of venue for the reason "that the minds of the inhabitants of the county in which the cause was pending are so prejudiced against the defendant that a fair and impartial trial cannot be had therein" are examined in open court in regard to the truth of said application, and their examination shows their means of knowledge was not sufficient to support, sustain or justify the statements made in their supporting affidavits, said supporting affiants are not credible persons within the statute requiring the application of a defendant for a change of venue to be supported by the affidavits of at least three credible persons. The application for a change of venue was properly denied.

The next error alleged, in the order of time on the trial, is that:

"The court erred in holding that the jurors W. C. Trask, R. A. Wilson, and W. D. Blackburn were qualified jurors to sit in said cause."

The rulings of the trial court upon the qualifications of Mr. Blackburn present the strongest case in favor of defendant's contention. The record shows his examination upon his *voir dire* as follows:

Examination by the State.

"Q. Have you ever read anything about this case, Mr. Blackburn? A. Yes, sir. Q. Did you ever talk to anybody who pretended to know anything about this case, about the facts in the case? A. Not that I remember of. Q. From what you read, did you form or express any opinion as to the guilt or innocence of

this defendant? A. No, sir. Q. Is your mind free at this time as to the defendant's guilt or innocence? A. Yes, sir. Q. Have you any prejudice against this defendant in your mind at this time? A. No, sir. Q. Have you any bias in his favor? A. No, sir. Q. Have you any conscientious scruples such as would prevent you from assessing the death penalty as a punishment for the crime of murder? A. No, sir. Q. Do you know of any reason at this time why you could not fairly and impartially try this cause according to the law and the testimony? A. No, sir. Q. If you are selected as a juror to try this cause, I will ask you if you will be guided alone in arriving at your verdict by the law as the court gives it to you in his instructions and the testimony of the witnesses as to the facts proved? A. Yes, sir."

Examination by Mr. Cruce, Counsel for Defendant.

"Q. Did you ever hear about this case? A. Yes, sir. Q. Who told you about it? A. I read it in the paper, I believe, the Sunday morning after it happened on Saturday night. Q. Read it in the— A. The Ardmorite, I believe. Q. Mr. Blackburn, did that article in the paper undertake to tell how this killing occurred? A. If I understand it right, it told what Mr. Carter said about it, what Mr. Carter had reported. Q. And it quoted Mr. Carter as being an eyewitness? A. Yes, sir. Q. And telling exactly how the killing occurred? A. Yes, sir. Q. Now, did you believe that report or not? A. Well, I didn't have any room to doubt it, Mr. Carter and his son, I believe. Q. Do you know Mr. Carter and his son, either one of them—did you at that time? A. I knew them both. Q. You knew them at that time? A. Yes, sir. Q. Now, you felt this way about it: that they had reported that and that it was true if they had reported it as it appeared in the papers? A. Yes, sir. Q And you stated that you had no reason to doubt that the paper had correctly reported Mr. Carter? A. No, sir. Q. So, then, from the newspaper article, you did form an opinion at that time as to whether or not—as to defendant's guilt or innocence? A. I thought from what the paper stated, if it was true, that he was guilty. Q. And you believed it? A. I believed it, yes. By Mr. Cruce: We challenge the juror for cause. By the Court: Q. Mr. Blackburn, you say that you formed an opinion as to the guilt or innocence of defendant on the merits of this case, the right or wrong of it, from what you read in the paper? A. Well, if Mr. Carter's statement in the paper was true, I believed he killed him. The Court: Yes, but did you

form an opinion as to whether it was a justifiable killing, or right or wrong? A. No, sir. The Court: Have you anything at all in your mind now or heart against this defendant? A. No, sir. None whatever. The Court: Anything standing in the way of your going into this jury box and trying him exclusively under your oath as a juror, according to the evidence and the court's instructions, without regard to what Carter said or anybody else? A. Not a bit. The Court: And will you do that? A. Yes, sir. The Court: Can you do it? A. Yes, sir. The Court: And you will do it? A. Yes, sir. The Court: Have you any bias or prejudice against him? A. No, sir. The Court: What you read there in that paper, will that make any impression on your mind that will influence your action as a juror—what you read in the paper, will that interfere with your action in arriving at a verdict if chosen as a juror in this case? A. No, sir. The Court: That won't make a bit of difference? A. No, sir. By Mr. Cruce: Q. I understood you to say that you knew the Carters who were quoted in that article? A. Yes, sir. Q. And you believed them to be truthful men? A. Yes, sir. Q. And that you believed the newspaper article wherein it quoted them? A. Well, I don't know that I believed it—but I got no room to disbelieve it. Q. You didn't disbelieve it? A. No, sir; I thought at the time it was true. Q. You thought at the time it was true? A. Yes, sir. Q. You thought at the time it was an unjustified killing? A. I didn't know whether it was justified or not justified. Q. I understand, you didn't know—but we are trying to get at what opinion you formed then from what you read? A. I had an opinion at that time that he was killed, if the statements were true. Q. That he was murdered? A. Yes, sir. Mr. Cruce: We renew our challenge. The Court: You still make me the same answers you made me a little while ago in answer to my questions? A. I don't see how I can do otherwise, Judge. The Court: Considering what you have read in the papers, considering what you might have believed about that, if it was true, it was only based on the hypothesis that it is true that you believe it? A. Yes, sir. The Court: But notwithstanding that, could you go into this jury box and try this man fairly and impartially, and consider all the evidence introduced for him and introduced against him, and reach a just conclusion under the law and under the evidence fairly, fearlessly and conscientiously, without regard to anything connected with the Carter interview? A. Yes, sir; what I read in

the papers hasn't got anything to do with me at the present time. The Court: Wouldn't have anything to do with your action as a juror or influence your verdict as a juror? A. No, sir. The Court: You don't know Mr. Turner, do you? A. I just know him when I see him. The Court: Is that all? A. Yes, sir. Mr. Cruce: We object to those leading questions at the hands of the court. The Court: I have got a right to inquire into the bottom of this business. Mr. Cruce:. I might state to the court, I don't believe any juror would purposely state that he could not give a man a fair trial. The Court: And I will state this, that any man on earth that you told there was a man killed would be bound to believe the man was killed, but he has got to hear the evidence of it to determine that as murder. My friend, it looks like we never could get a jury in the face of such inquiry— A. (interrupting) I don't mean to state what my opinion is at the present time, that the man was killed—it depends on the evidence. Mr. Cruce: We except to the remarks of the court. The Court: I will overrule the challenge at present. And to the ruling and action of the court the defendant at the time excepted."

R. A. Wilson, upon his examination, testified that he was a farmer: did not know the deceased or the defendant; that he had not talked to anybody about the facts in the case, but thought that he read about it in the papers; that his mind was perfectly free from any opinion as to the guilt of the defendant. On examination by counsel for defendant he stated:

"Q. Did the article that you read in the paper undertake to tell how that killing occurred A. I think it did. Q. It undertook to tell who did the killing and how it occurred? A. Yes, I remember it stated who did the killing, or who was supposed to do the killing. Q. And how it occurred. The circumstances of how it occurred. A. I think it aimed to, yes. Q. Did you believe that? A. Of course, it made an impression, that a killing had been done out there. I did not know whether the facts were true or not. Q. Of course you didn't know, but what I am asking you is whether you believed the statements as you read them in the paper or not? A. It left me in doubt—I didn't know whether it was true or not. Q. Did you believe or disbelieve it? A. I don't know as I could say especially either way, because I don't know about that. Q. Did you accept any part of this article as true that you read? A. Why, of course, I was inclined to the

opinion that there was a tragedy committed, but I did not know whether the facts as stated— Q. I understand you did not know —but what did you believe about the facts as stated by the paper? A. I will state that I did not know whether they were true or not? Q. Did you believe them? A. I don't know whether I could say I did or not."

W. C. Trask testified that he had read an account of the case in a newspaper, but had not talked with any person about the facts. Examined by counsel for defendant he stated: That he had not formed or expressed an opinion as to the guilt or innocence of the defendant, and had then no definite opinion on the question. That what he had read had created no more than an impression, and that notwithstanding any impression he might have he would lay it aside and try the defendant fairly and impartially under the law and the evidence in the case.

Each of these jurors was challenged peremptorily, and the defendant having exhausted all his peremptory challenges, his counsel stated, as shown by the record, that:

"In order to save the point, we think the court has made us exhaust challenges on jurors that we ought not to have had to."

Whereupon the court announced that each party might have one more challenge. The defendant objected to the court giving the state another challenge. Whereupon the court stated:

"Let the record show that I have tendered to the defendant and state each one challenge extra, this because I sustained a challenge to a juror made by defendant, when I should not have done so, over the objection of the state."

The defendant excepted to the action of the court, the state waived further challenge, and without further challenge, the jury was sworn to try the case.

These jurors were challenged for actual bias, which is defined in paragraph two of section 6811, Snyder's Statutes, as:

"For the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial

4 Cr.—12

rights of the party challenging, and which is known in this chapter as actual bias."

Section 6814, Snyder's St., that:

"In a challenge for actual bias, the cause stated in the second subdivision of the third preceding section must be alleged; but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him."

The court correctly overruled the challenge for cause to the juror Wilson. His belief, impression or opinion only went to the undisputed fact that the defendant took the life of McCumber. He did not know the deceased, nor the defendant; there was nothing to show bias or prejudgment; he had not talked with any person about the facts, but he had read a newspaper account of the tragedy that made an impression which was not positive or fixed, and he stated that he did not know whether the facts stated were true or not. Such an impression is not an opinion upon the merits of the case.

In 1 Burr's Trial 416 (Fed. Cases No. 4693) Chief Justice Marshall used this language:

"Light impressions, which may be supposed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them, which will combat that testimony, and resist its force, do constitute a sufficient objection to him."

In the case of *Holt v. People,* 13 Mich. 224, Justice Cooley, speaking for the court, used this language:

"To require that jurors shall come to the investigation of criminal charges with minds entirely unimpressed by what they may have heard in regard to them, or entirely without information concerning them, would be, in many cases, to exclude every man from

the panel who was fit to sit there. With the present means of information, the facts or rumors concerning an atrocious crime are, in a very few hours, or days at the farthest, spread before every man of reading and intelligence within the district from which jurors are to be drawn—and over the whole county, if the atrocity be especially great. And there are some crimes so great and striking, that even the most ignorant will have information and impressions in regard to them; and the rule, as stated, applied to such cases, would render the impaneling of a jury for their trial impossible, and make their very enormity a complete protection from punishment."

. One accused of crime is by the Constitution guaranteed a fair and impartial trial (Const., Bill of Rights, sec. 20), but to insure this, it is not meant that jurors shall never have heard of the case, or shall not have any impressions concerning any of the facts. In this day and age it would be difficult to find citizens competent for jury service who have not some impression as to the case, derived from newspaper accounts. The constitutional guaranty only excludes those jurors who have an opinion upon the merits of the case, upon the guilt or innocence of the accused of the crime charged, based upon such testimony as may reasonably be expected to be presented upon the trial, or an opinion founded on personal ill-will towards the accused.

"The question of the competency of jurors is addressed to the sound discretion of the trial court, and, in the absence of an abuse of that discretion, it is not subject to review. In other words, while the trial court must be clearly satisfied that a juror is fair and impartial before permitting him to sit in a criminal case, yet, upon appeal to this court, it must be clearly shown that the trial court abused its discretion before this court will review its rulings in this respect." (*Johnson v. State*, 1 Okla. Cr. 347 [97 Pac. 1059]).

The challenge as to the juror W. C. Trask depends upon a state of facts so similar to that just decided that further consideration would be profitless.

As to the juror W. T. Blackburn the case is different. It will be noticed that this juror upon his *voir dire* testified that he had an opinion that the defendant was guilty formed from reading a

newspaper account of the tragedy. That this newspaper quoted what Mr. Carter, an eyewitness, stated; that he knew Mr. Carter and his son, and had no reason to doubt the newspaper account, and he believed it to be true, that he was acquainted with defendant, and it was his opinion that the deceased had been murdered, and that the defendant was guilty. His examination clearly indicated a settled conviction, a fixed belief, which is something very different from the mere impression, which every man receives from hearing or reading statements of a happening. Can it be said that a juror who possesses an opinion that the accused is guilty, and who having such an opinion, would continue to entertain the same until it should be removed by evidence, is an impartial juror? How would it be possible for this juror to presume that the defendant was innocent until the contrary was proved? Would he not rather presume the defendant was guilty until the contrary was proved?

Section 6828, Snyder's St. provides:

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to be acquitted."

But it may be said that the juror stated upon his *voir dire* that he had no bias or prejudice against the defendant, and that he could try the case fairly and impartially, and notwithstanding his opinion he would be governed exclusively by the evidence in the case and the instructions of the court regardless as to what Carters had said. These statements were made in response to leading questions by the court, which questions were objected to by the defendant.

In the case of *State v. Otto,* 61 Kan. 58 (58 Pac. 995), Justice Smith, delivering the opinion of the court, used this language:

"It is the duty of the court, imposed both by statute and by the principles of natural justice, to stand as a vigilant guard over the jury-box, to the end that bias, prejudice and preconceived opinion do not enter. It is better that the first impression of a case

come from the testimony of the witnesses after the jurors are sworn to try the cause. While there is recognized in the law a distinction between an impression and an opinion, yet there is so little difference between the two, and the step so short from one to the other, that courts should be certain that a juror's mind which is possessed of the one has received it with pressure too weak to break over the dividing line."

The juror was probably sincere in his answers to the questions propounded, and he probably would make the same statements even though the questions were not leading, as he undoubtedly and honestly believed that he could try the case impartially. Men are seldom conscious of being biased or prejudiced, or of being in such a condition of mind that they could not try any case impartially.

In the case of *Scribner v. State,* 3 Okla. Cr. 601, 108 Pac. 422, four jurors who were accepted by the court over the challenge of the defendant, and who formed part of the panel which tried the case, stated on their *voir dire* that they had formed opinions from what they had heard and read as to the guilt of the defendant, and each further stated that his opinion was such as would require evidence to remove, but that notwithstanding such opinion he could and would act impartially and fairly upon the matters to be submitted and give the defendant a fair and impartial trial. These jurors were held disqualified. Owen, Judge, delivering the opinion of this court, said:

"In determining this case, although the evidence may show the defendant guilty beyond all peradventure of a doubt, and sufficient to support a verdict with the death penalty, we must nevertheless set a precedent under which a perfectly innocent man may be tried and have preserved to him his constitutional rights of the presumption of innocence, and a trial before an impartial jury. If a juror has prejudged the guilt of the defendant, before hearing the sworn testimony, then it cannot be said that the defendant had a trial before an impartial jury. It is a physical impossibility for a juror, who has an opinion based on what he has understood to be the facts in the case, to weigh the evidence as though he had never heard of the case and had not already made up his mind; he may have an earnest and conscientious desire to do so and to

deal out exact justice, but he will unconsciously attach a greater weight to the evidence which conforms to his preconceived opinion than he would otherwise do. He is not in the frame of mind which the Constitution contemplates and which is necessary to enable him to fairly and impartially judge as to the weight to be given to the evidence of each witness appearing before him. The determination of the qualifications of a juror is a matter addressed to the discretion of the trial court, and the question to be determined here is whether the trial court in this case abused this discretion to the prejudice of the defendant. After a careful review of the numerous authorities called to our attention by the counsel in the case, and those which we have been able to find by our own efforts, we are convinced that the court did abuse such discretion to the prejudice of the defendant. The principle that every reasonable doubt must be resolved in favor of the defendant applies in this instance as well as to the evidence offered before the jury on the final trial. The evidence offered as to the qualifications of the jurors enters into and becomes a material part of the trial, as much so as the evidence offered by the witnesses on the part of the state, and in this case the trial court should have resolved that doubt in favor of the defendant and sustained his challenges for cause to these jurors."

Under the statute an opinion formed or expressed as to the guilt or innocence of the defendant founded upon rumor or newspaper reports does not disqualify a juror, provided it appears to the court, upon the declaration of said juror, he can and will, notwithstanding such opinion, act impartially and fairly upon the law and evidence. As we construe the statute the competency of a juror is a question of fact to be determined by the court in the exercise of a sound discretion and constitutes a legislative definition of the constitutional provision; however, it can not be regarded as changing in any degree the essential qualifications which jurors must possess. It merely furnishes a test by which those qualifications are to be determined. It makes the declaration of the juror, "that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him, competent, as bearing upon the question of his impartiality, and requires the court to consider such declaration, when so made."

The statute does not attempt to determine what shall be the probative force of the declaration of the juror, or how far it shall have the effect of relieving him on the disqualification arising from such an opinion. The declaration when so made is evidence to be received and given such weight as, under all circumstances appearing, it is fairly and justly entitled to. Before it can operate to remove the disqualification, the court must be satisfied of its truth, and that question is left to be determined from all the facts and circumstances appearing from his examination upon the *voir dire*.

In the case *Coughlin v. People*, 144 Ill. 140, a similar statute was construed. Chief Justice Bailey, rendering the opinion of the court, in part said:

"In the review of the authorities we have already made, it has sufficiently appeared that, where the opinion of the juror is only slight or transient, or is hypothetical, very considerable reliance is placed upon his statement under oath, that his opinion is not of such character as will interfere with his action as a juror. Indeed, where the opinion is shown to be of that character, such statement is usually one of the most satisfactory tests of the juror's impartiality. But the holding of this and other courts is substantially uniform, that where it is once clearly shown that there exists in the mind of the juror, at the time he is called to the jury box, a fixed and positive opinion as to the merits of the case, or as to the guilt or innocence of the defendant he is called to try, his statement that, notwithstanding such opinion, he can render a fair and impartial verdict, according to the law and the evidence has little if any tendency to establish his impartiality. This is so because a juror who is shown to have in his mind a fixed and positive opinion as to the guilt or innocence of the accused, is not impartial, as a matter of fact, to say nothing of those legal conclusions which formerly prevailed, and which would still prevail, if the statute were not in existence. His statement that he can render a fair and impartial verdict does not tend to show that he is not partial, since it does not tend to show the non-existence of the fixed and decided opinion to which he had already confessed. It merely tends to show that the juror, while admitting that he has prejudged the prisoner's case, believes in his ability to act as though he had not done so, or that, while admitting his actual partiality, he believes in his ability to act

as though he were impartial. It being constantly kept in mind, that the fact to be proved by the juror's answer is, that he is impartial, in the constitutional sense of the word, it is difficult to see how, after a juror has avowed a fixed and settled opinion as to the prisoner's guilt, a court can be legally satisfied of the truth of his answer that he can render a fair and impartial verdict, or find therefrom that he has the qualification of impartiality, as required by the Constitution."

The fact in the present case that the juror was possessed of an opinion that the defendant was guilty, and that this opinion was based upon the statements of the two principal witnesses for the state, whose names appear as the first endorsed upon the indictment, and upon whose testimony the state expected to prove its case, was clearly sufficient to render the juror incompetent, and we believe that the court below erred in overruling the defendant's challenge for cause to the juror Blackburn. The juror was challenged peremptorily by the defendant, but it is insisted that, inasmuch as the defendant had exercised all his peremptory challenges before the panel was finally completed, the fact that said juror did not sit upon the panel to try the cause should not deprive the defendant of the benefit of his exception, if his challenge for cause was erroneously overruled. The important question presented is: Should the case be reversed for error committed by the lower court in overruling the challenge for cause, even though the defendant exercised all his peremptory challenges, unless it is further shown that an objectionable juror was forced upon him after he had exercised his peremptory challenges?

The constitutional guaranty is that:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed." (Sec. 20, Bill of Rights.)

Not that the accused shall have the right to be tried by the kind of a jury he wants, but by an impartial jury. When that end is attained in the selection of the jury to try him, the full measure of his constitutional right is allowed. To enable him to

secure an impartial jury the law has wisely and humanely prescribed the requisite qualifications for true and impartial jurors, and has declared those incompetent and disqualified who do not fulfill these requirements. And the statute gives to him the right to challenge any juror for any one of the causes of disqualification therein enumerated. A challenge for cause is an objection made to a particular juror, alleging disqualification, for actual or implied bias. His cause of challenge may or may not be true in fact; whether it is or not is a matter to be tried by the court in the exercise of a sound discretion. In addition to this right of challenge for cause, as a matter of favor and grace the law gives to him in a capital case nine peremptory challenges (Sec. 6807, Snyder's St.), which he can use at his pleasure, without assigning any reason therefor. But the law does not prohibit a defendant from using them where he has a reason for or cause to rid himself of a juror. In other words, the law nowhere says that he cannot and shall not use his peremptory challenges on a disqualified or incompetent juror; on the contrary, he may do so, or not, just as he sees fit. If he does so, he has excluded the juror, and his objection is of no avail. If he does not, then he waives his objection and can not complain, unless he has shown the exercise of all his peremptory challenges, and that he has had an objectionable juror put upon him, whom he could not get rid of.

Blackstone explains the reasons why the right of peremptory challenge was conferred by the law of England. He says:

"In criminal cases, or at least in capital ones, there is *in favorem vitae* allowed to the prisoner an arbitrary and capricious species of challenge to a certain number of jurors, without showing any cause at all; which is called a peremptory challenge,—a provision full of that tenderness and humanity to prisoners for which our English laws are justly famous. This is grounded on two reasons: 1. As every one must be sensible what sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another, and how necessary it is that a prisoner (when put to defend his life) should have a good opinion of his jury, the want of which might totally disconcert him the law wills not that he should be tried by any one man against

whom he has conceived a prejudice even without being able to assign a reason for such his dislike. 2. Because, upon challenges for cause shown, if the reason assigned prove insufficient to set aside the juror, perhaps the bare questioning his indifference may sometimes provoke a resentment, to prevent all ill-consequences from which a prisoner is still at liberty, if he pleases, peremptorily to set him aside." (3 Cooley's Black., Book iv, p. 352.)

Discussing the result which follows the use of a peremptory challenge on an incompetent juror, White, Presiding Judge of the Court of Appeals, in the case of *Loggins v. State,* 12 Tex. App. 65, said:

"But, as stated by Blackstone, one of the reasons they were given him by the law was that he might be enabled to use them in getting rid of a juror he has ineffectually endeavored to challenge for cause.

"Now, suppose the court below has committed an error in its rulings on the qualifications of jurors, how and under what circumstances can the accused avail himself of the error and have it revised and corrected on appeal? In *Holt v. State* this court held that unless objection is shown to one or more of the jury who tried the case, the rulings of the trial court upon the competency or incompetency of jurors will not be inquired into in this court, even though the defendant had exhausted his peremptory challenges. 9 Texas Ct. App. 571. In *Cotton v. State,* 32 Texas, 642, it was said: 'The court cannot regard the objection to the ruling of the court upon the competency of a juror as a valid one, unless the accused had been thereby compelled to accept an objectionable juror, after the exhaustion of his right of challenge.' In *Myers v. State,* 7 Texas Ct. App. 653, it is said: 'The substance of the statement is that four persons were placed upon the jury after the defendant's peremptory challenges had been exhausted, but there is no pretense that either of these four persons were in any manner objectionable to the defendant, nor is it made to appear that they or either of them would have been challenged peremptorily if his challenges had not been exhausted. By this ruling it is not seen that the defendant was deprived of any right guaranteed to him by the law.'

"And in *Tooney's Case,* 8 Texas Ct. App. 457, it was said: 'So in the present case, even if in our opinion the court had in fact erred in overruling the challenge for cause of the proffered

jurors, Williams and others, still such error would be no cause for the reversal of the judgment, for the reason that they, being peremptorily challenged, did not form any part of the jury by whom the verdict was rendered, and because it is not shown that the juror Orrick, who was placed on the jury after the defendant's peremptory challenges had been exhausted, was not a fair and impartial juror, or that because of his presence on the jury the trial was not fair and impartial as to both the state and the defendant.'

"In Rothschild's Case, 7 Texas Ct. App. 519, it was held a reversible error to overrule a good challenge for cause to the juror Sanders. The language of the court is: 'And thereupon the court again overruled the challenge for cause, and the defendant challenged peremptorily, but, having exhausted his peremptory challenges, the juror was sworn and took his seat upon the jury.'

"We are asked to overrule these cases, or, rather, the doctrine thus enunciated by them. A mature reconsideration of the subject, in connection with this motion for rehearing, has only tended to confirm and strengthen us in the correctness of the doctrine thus stated. We are unable to perceive how the accused is deprived of any legal right by the ruling. Certainly not as to any of his peremptory challenges, for, as we have seen, he has had the full benefit of all the law allows him. Nor can he complain that he has been deprived of a valid challenge for cause, because as to that he has rid himself of the cause by his peremptory challenge. Moreover, the court below has decided that his challenge for cause was not good, and *prima facie* the ruling was correct. If not, then why did he not stand upon the validity of the challenge without resorting to a peremptory one? and then and in that event, if the juror was impaneled and his peremptory challenges afterwards exhausted, he would reasonably have had good ground for complaint, and one which could and would be heard and corrected in this court. Simply to be overruled in a good challenge for cause cannot deprive him of a material right; for challenges for cause are inexhaustible, and the overruling of one cannot deprive him of another, even though his peremptory challenges may be exhausted. So long as there exists a cause, just so long has he the right to challenge, and no deprivation of the right as to one juror can possibly affect the right as to another.

"But it is said he might have wanted to use the peremptory challenge on one of the final panel. This is mere speculation, and,

if permitted to be indulged, might be urged indefinitely. The simple question, after the peremptory challenges are exhausted, is: 'Is the jury which finally tries the case impartial?' If so, we cannot imagine that the accused has any just ground of complaint with regard to it. All that the Constitution, all that the law requires and demands is a trial by an impartial jury. If he makes no complaint or has no complaint to make of its as finally organized, the presumption is legitimate that it is impartial."

While it is insisted in this case that defendant exercised all his peremptory challenges, the record on the contrary affirmatively discloses that before the jury was sworn to try the case the court offered to allow the defendant an additional peremptory challenge, which defendant refused to exercise, ostensibly for the reason that the same offer was made to the state. But the state waived it. There is nothing in the record to show that an incompetent, disqualified or otherwise objectionable juror was forced upon defendant. The error of the court in overruling the challenge for cause to the juror Blackburn was also waived by the defendant in not exercising all his peremptory challenges, therefore it cannot be available as error in this court.

The next assignment is:

"The court erred in questioning witnesses during the trial of the cause, thereby indicating to the jury the state of the court's feeling in the case."

The record will be searched in vain to find any justification for the claim. On the contrary it shows a commendable care and consideration for the rights of the defendant.

Another assignment is based on exceptions to rulings on questions of evidence. We do not think any of the exceptions well taken, or that they require discussion.

The fourth and fifth assignments of error challenge the correctness of the court's charge to the jury. The court's charge consisted of twenty-six instructions. Believing that the instructions excepted to furnish in themselves better proof of their correctness, fairness and comprehensiveness in application to the facts of the case than could be demonstrated by any discussion of them,

we will here insert them together with the instructions given in lieu of those requested by defendant. They are as follows:

"Instruction No. 9. In this case, the defendant, in support of his plea of not guilty, claims as a justification of such homicide that he acted in self-defense of his person, and you are instructed that under the law, before a person can justify a killing upon the plea that he acted in self-defense, there must not only have existed at the time of the killing reasonable ground to apprehend a design on the part of the deceased to either take the life of the defendant or do him some great bodily injury, but in addition thereto, it must reasonably have appeared to the defendant that there was at the time imminent danger of such design being carried out.

"10. While a person need not be in actual, imminent peril of his life being taken, or of great personal injury being done him, yet if the jury believe that the defendant had reasonable ground to believe and did believe from the facts as they reasonably appeared to him at the time that the danger was so urgent and pressing, or apparently so urgent and pressing, that the defendant could not avoid the necessity of killing in safety to himself, to protect himself from death or great personal injury, then if under such circumstances the killing took place, it was justifiable. (Given and excepted to by defendant. S. H. Russell, Judge.)

"11. In this connection you are told that self-defense under the law is a defensive and not an offensive act, and for a person to avail himself of a plea of self-defense in order to justify a killing, it must reasonably appear to him at the time he fired the fatal shot, if you find he did so fire it, that the act upon the part of the deceased by which the defendant seeks to justify the killing was such an act as made it reasonably to appear to him at the time that he was in danger either of losing his life or of great personal injury being done him, and it is the duty of a person, so threatened with danger to his life or of great personal injury being done him, to use at the time all reasonable means apparent to a reasonable person under the circumstances, to avoid such danger before taking human life; except that he is not bound to retreat to avoid such necessity or apparent necessity of killing, provided he is in a place where he has a right to be and has done no act upon his part to bring about the attack, or threatened attack, if any, by the deceased. And in this connection you are told that a bare fear that at some future time from the time at which the person claims

to have so acted, that his life would be taken or great personal injury done him by the deceased, will not justify a killing. (Given and excepted to by defendant. S. H. Russell, Judge.)

"12. In determining the question as to whether or not the defendant was in danger or apparent danger, under these instructions, you are told that the law requires you to view the circumstances at the time from the defendant's standpoint, as they reasonably appeared to him, that is, that the circumstances under which the killing occurred, as they appeared to him, were sufficient to excite the fear of a reasonable person that his life was in danger or in danger of a great personal injury being done or apparently so and that he really acted under the influence of such fear at the time.

"14. Bearing in mind these principles of the law, you are instructed, if you find and believe from the evidence beyond a reasonable doubt, that in the county of Carter and State of Oklahoma, that on or about the 19th day of September, 1908, or at any time before the filing of the indictment in this case, that the defendant, Frank Turner, did, in the manner and with the purpose and intent charged in the indictment shoot and kill the deceased, Charles McCumber, and that said killing when perpetrated was done with a premeditated design to effect the death of the said McCumber, and that the defendant unlawfully and with such premeditated design to effect the death of the deceased, did shoot and kill him, the said McCumber, then it is your duty to find him guilty as charged in the indictment and you are instructed that it is immaterial in law what length of time elapsed between the formation of the design and the execution of it.

"15. If you should believe from the evidence, beyond a reasonable doubt that the defendant, Frank Turner, armed himself with a deadly weapon and voluntarily went to the scene of the homicide and placed himself at the scene of the homicide for the purpose of meeting the deceased and with the intent and purpose to produce the occasion of a meeting with the deceased, with the purpose and intent to then and there kill the deceased, and with the premeditated design to effect the death of the deceased, and that he did then and there under such circumstances without any act at the time on the part of the deceased manifesting a purpose to take his life or do him great personal injury, shoot and kill the deceased as alleged in the indictment, then it is your duty to find the defendant guilty of murder and so say by your verdict. And

in this connection you are told that should you believe that before the fatal shot was fired the deceased by some act then done manifested a purpose to attack the defendant, yet if you believe beyond a reasonable doubt that the defendant provoked the deceased into doing such an act, and as a result thereof he then and there shot and killed the deceased, in pursuance of a premeditated design to effect his death, then you are told that such killing is murder. (Given and excepted to by defendant. S. H. Russell, Judge.)

"16. If you have a reasonable doubt that the defendant is guilty of the crime of murder, as herein instructed, then you may next inquire as to whether or not he is guilty of the crime of manslaughter in the first degree. Therefore, if you believe from the evidence, beyond a reasonable doubt, that the defendant, in the County of Carter and State of Oklahoma, on or about the 19th day of September, 1908, did unlawfully shoot and kill the deceased, but that such act of killing was perpetrated without a design to effect the death of the deceased, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, then you will find the defendant guilty of manslaughter in the first degree and say so by your verdict, unless you should believe that said killing was committed under such circumstances as constitute justifiable homicide as herein instructed.

"17. If you believe from the evidence, or have a reasonable doubt thereof, that the defendant was at the scene of the homicide and armed with a shotgun, in pursuance of a lawful purpose of protecting his property, or was on his return from the performance of an act of protection to his property, then you are instructed that he had a lawful right to be there, and if under such circumstances he unexpectedly met up with the deceased, at the place where the homicide occurred, and you further believe, or have a reasonable doubt thereof, that upon the approach of the deceased, at the place, that he, the deceased, without any act upon the part of the defendant showing a purpose to do bodily harm to the deceased, did then and there, by some act upon his part then done, make it reasonably to appear to the defendant, judging from his standpoint, that it was the purpose and intent of the deceased to then and there kill the defendant or do him great personal injury, then the defendant under such circumstances had the right to shoot in his self-defense, and if he did so shoot and kill the deceased, under these circumstances, then you are instructed that the

homicide is justifiable and you should find him not guilty. (Given and excepted to by defendant. S. H. Russell, Judge.)

"18. You are instructed that insulting words, or insulting conduct or epithets, or assaults previously made, that is anterior to the actual time of the killing, had and done to the defendant at other and different places than at the scene of the homicide, if you find that any such were had and done, nor insulting epithets, no matter how opprobrious, uttered at the time of the killing do not justify or mitigate a homicide. You are further instructed that threats to kill another, communicated to him prior to the homicide, are not sufficient to either justify or mitigate homicide, and before a defendant can justify a homicide upon the ground of threats to take his life that have been made by the deceased and communicated to the defendant before the homicide, if any, or before he can be justified in shooting a person so threatening his life, there must have been done, at the time of the killing, some act upon the part of the person so threatening, which viewed in the light of the threats, manifested a purpose on the part of the person doing the threatening to carry said threats into execution, or to do some great personal injury to the person threatened. Therefore you are instructed, that if you believe from the evidence that the deceased in this case had threatened to take the life of the defendant, and that such threats to take his life were prior to the homicide communicated to the defendant, and that at the time of the killing the deceased by some act then done, manifested a purpose to carry such threats into execution and that the threatened attack had then begun, before any act upon the part of the defendant, which manifested a purpose on his part to first attack the deceased with a deadly weapon, and that under such circumstances the defendant shot and killed the deceased, said homicide is justifiable and he should be acquitted. (Given and excepted to by defendant. S. H. Russell, Judge.)

"19. You are instructed that in determining whether at the time of the killing there was an act done by the deceased in advance of any act done by the defendant, and which act upon the part of the deceased manifested a purpose to carry such threats into execution, that it is your duty to view the matter from the standpoint of the defendant, and if you believe that he had reason to believe and did believe that such was the purpose and intent of the deceased, and that it was necessary or apparently necessary for him to shoot to prevent the execution of such threats, if any,

and under such circumstances the defendant fired the fatal shot, he should be acquitted.

"20. If you find and believe from the evidence beyond a reasonable doubt that the defendant shot and killed the deceased and you further find and believe beyond a reasonable doubt that his sole purpose in shooting and killing him was from motives of revenge for any real or imaginary wrong previously inflicted upon him by the deceased, if any, and that such motive was the sole moving cause of the killing, then the killing under such circumstances and for such reason is murder, and if you so believe, beyond a reasonable doubt, you will return a verdict of guilty of murder as charged in the indictment.

"21. If upon the whole case you have a reasonable doubt of the guilt of the defendant as charged of any offense herein submitted to you under these instructions, it is your duty to find the defendant not guilty and say so by your verdict."

The foregoing instructions correctly and completely cover the instructions requested.

While counsel in their brief hypercritically state that:

"There was little left for the jury to do in this case under the court's instructions but convict the defendant. It is surprising in view of the record in this case, and the court's charge that the defendant did not get the death penalty."—

We are of opinion that upon the undisputed facts the jury would have been justified in assessing the extreme penalty of the law, and their failure to assess the same confirms our conclusion that the defendant was accorded a trial more lenient even than a fair and impartial one.

The judgment of the District Court of Carter County will therefore be affirmed.

FURMAN, PRESIDING JUDGE, and RICHARDSON, JUDGE, concur.