## ALVERTA B. GENTRY v. STATE.

No. A-1816. Opinion Filed March 3, 1915.

(146 Pac. 719.)

1   APPEAL—Discretionary Ruling—Change of Venue. A petition for a change of venue is addressed to the sound discretion of the trial court, and, unless it clearly appears that there is an abuse of such discretion, this court will not reverse the judgment for the failure of the trial court to grant a change of venue.

2.   VENUE—Change of Venue—Discretion. It is not an abuse of discretion to deny a petition for change of venue in a capital case, which was based on the alleged prejudice in the minds of the people of the county, caused by the publication in certain newspapers of prejudicial accounts of the murder, such newspapers having a

large circulation in the county, where the prima facie case made by the affidavits filed by the defendant is fully answered and clearly overcome by the counter affidavits filed by the state.

3.  **APPEAL—Discretionary Ruling—Continuance.** An application for a continuance in a criminal case is addressed to the sound discretion of the trial court, and, unless it clearly appears that there is an abuse of such discretion, this court will not reverse the judgment for the refusal to grant a continuance.

4.  **CONTINUANCE—Grounds—Discretion.** It is no abuse of discretion to overrule an application for continuance on the ground of absence of witnesses, who are out of the state, where it is not shown that any one of them would or could be procured within any reasonable time, and where no diligence is shown to procure their attendance, or to take their depositions, and where their alleged testimony, considered in connection with other facts proven on the trial, appears to be probably untrue.

5.  **JURY — Disqualification of Juror—Validity of Statute.** Procedure Criminal, sec. 5861 (Revised Laws 1910), providing that "no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him," is not unconstitutional.

6.  **SAME—Appeal—Discretionary Ruling—Challenge to Juror for Cause—Opinion.** The issue raised upon a challenge for cause to a juror in a criminal case, on the ground that he had formed or expressed an opinion as to the issues to be tried, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by an appellate court, unless it appears upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial.

7.  **SAME—Grounds.** The trial court's refusal to sustain a challenge to a juror for cause will not be disturbed by an appellate court, where it appears from the examination of such juror that he had not talked with any one who purported to know about the case of his own knowledge, but had read full accounts of the tragedy in the newspapers, and that he had no opinion other than that derived from reading newspapers, and that he was positive that he could disregard that opinion, and try the case solely upon the evidence, fairly and impartially.

8.  **HOMICIDE—Murder—Sufficiency of Evidence.** In a prosecution for murder, the evidence examined and held sufficient to support a conviction without the death penalty, and that no prejudicial error was committed on the trial.

(Syllabus by the Court.)

*Appeal from District Court, Oklahoma County;*
*A. H. Huston, Assigned Judge.*

Alverta B. Gentry was convicted of murder, and she appeals. Affirmed.

The plaintiff in error, Alverta B. Gentry, and Maurice Weightman and Jess K. Mackey were charged jointly with the murder of Thomas J. Gentry, alleged to have been committed in Oklahoma county, on the 6th day of January, A. D. 1912, by shooting with a pistol. Upon her separate trial she was found guilty of murder, and her punishhment fixed at imprisonment in the penitentiary for life at hard labor. A motion for a new trial was duly filed, which was overruled, and on the 15th day of March, 1912, judgment was rendered in pursuance of the verdict. To reverse the judgment, an appeal was taken by filing in this court on August 19, 1912, a petition in error with case-made.

The evidence shows, or tends to show, the following facts:

On Sunday morning, January 7, 1912, the dead body of Thomas J. Gentry was found in a chair in the front room of his home. A *post mortem* examination disclosed that a pistol ball had entered at the back of the head about an inch below the crown.

Thomas J. Gentry, the deceased, and Alverta B. Gentry, the plaintiff in error, had been married about six years at the time of the tragedy, and were living at that time in the 1500 block, Linwood Boulevard, in Oklahoma City; his place of business being 519 North Broadway. Defendant Maurice Weightman is a brother of the plaintiff in error.

Jess K. Mackey and Maurice Weightman were friends and associates, and were frequently together in the Gentry home. It appears that Mackey became the paramour of Mrs. Gentry, and during the year 1911 they had numerous clandestine meetings for the purpose of illicit intercourse, and frequently took trips to neighboring towns and remained for days at hotels; that Mrs. Gentry paid the expenses of these trips; that her infatuation for Mackey became so intense that she determined to get rid of her husband, and several witnesses testified that she said she was either going to get rid of him or get a divorce from him. In November, 1911, Mrs. Gentry and Mackey and one Billy Lee met at a hotel in Oklahoma City, and, after drinking some beer, Mrs.

Gentry and Mackey discussed plans with reference to the disposition to be made of Mr. Gentry. A few days later the same parties met on the street corner near the Gentry home, and this subject was discussed. Mrs. Gentry stated at that time that she intended to hire a boy, formerly an employee of Mr. Gentry, to kill him; that she was going to do this because Mr. Gentry was unkind to her and she was in love with Mackey. She further stated that she thought it was better for Mackey to leave the city while she procured this boy to kill Mr. Gentry. Shortly afterward Mackey left Oklahoma City and went to Taylor, Tex., and remained there a month. While he was there Mrs. Gentry wrote him several endearing letters, and talked to him over the long distance telephone, and sent him money to pay his return car fare. In those letters she told Mackey that the young man who was to do the work had left the city, and asked Mackey to return at once. About the 8th of December, 1911, Mackey returned, and went immediately to the Gentry home, and their illicit relations were again renewed.

On the evening of the 8th day of December, Mrs. Gentry, Mackey, and Weightman were at the Gentry home, and went from there to East Sixth street. Mackey and Weightman left East Sixth street and went to West Main, and met a man by the name of Wyont. Weightman purchased some whisky and returned to the barber shop where he had left Mackey and Wyont. Weightman at that time had an automatic revolver in his pocket, the property of Mr. Gentry. These three had a conversation, in which Weightman requested Wyont to go with him and Mackey to the corner of Fifth and Braeur streets, which is one-half block east of the Gentry home, and stated that at that place when Gentry came home they could shoot him. Wyont refused to go. Weightman and Mackey proceeded to Fifth and Braeur streets, and then went to the Rock Island depot to meet Mrs. Gentry, as they agreed they would do when they left her on East Sixth street earlier in the evening. When they met Mrs. Gentry they told her they had not seen Gentry and consequently could not kill him. Thereupon, Mrs. Gentry suggested to them that they go up to the shop on North Broadway and kill him there, and that she would go to the

terminal station and wait for them. Weightman and Mackey went to the shop, but Mr. Gentry was not there, and they returned to the terminal station and told Mrs. Gentry that he was not at his place of business. Weightman there left them, and Mackey went home with Mrs. Gentry. After this date Weightman and Mackey met Mrs. Gentry daily at the Gentry home, and about this time Mrs. Gentry requested two parties to purchase some whisky for her, and she purchased some whisky and placed poison in it and set it in the kitchen cupboard so that Mr. Gentry would drink it, and shortly afterward Mrs. Gentry and Mackey went to Chickasha, and she told Mackey that she had that morning disguised herself in boy's clothes and gone to a negro druggist on East First street and bought some poison and placed it in a bottle of whisky and put the whisky where Gentry would see and drink it, and for this reason she wanted to go to Chickasha, and wanted Mackey to accompany her, so that they would not be suspicioned if Gentry drank the whisky. They stayed at the Elliott Hotel, in Chickasha, for two days, registered as man and wife. Mackey then returned to Oklahoma City, and immediately saw Weightman, who was running a cigar stand on Grand avenue, and Weightman told him that he had been unable to get Gentry to drink any of the poisoned whisky, and asked Mackey if he could get him some poison so that he could place it in Gentry's food to kill him that way. On January 2nd, Mrs. Gentry returned to Oklahoma City, and, instead of going to her home, she went to the Parkinson Hotel, and stayed that night with a man by the name of Pickron, and the next day returned to her home. On that day Weightman and Mackey went to a drug store on East Grand avenue which was run by a negro, and Weightman bought some arsenic, telling the druggist that his sister had sent for it. From the drug store these two went to Norton's Grocery, in the western part of the city, and Weightman bought some milk and other eatables, and had them charged to Mr. Gentry. From Norton's store they went to the Gentry home, and Weightman put the arsenic in some milk and set the bottle on the back porch. Mrs. Gentry, on January 3rd, stated to the witness Pickron that she found the milk there, and it had arsenic in it. On January 4th,

Mrs. Gentry, Weightman, Cleve Wyont, and Mrs. Jack Besse, a cigar girl in the employ of Weightman, met at the Gentry home, and Mrs. Gentry asked Wyont to procure her a bottle of whisky with the seal unbroken. Mrs. Gentry and Wyont drove downtown from the Gentry home and met Mackey, who returned with her to her home, and she then told Mackey that she intended to put poison in some whisky in such a way that Gentry would not suspect anything and would drink it. The next day, Saturday, she, Mackey, and Weightman were at the Gentry home, and while there Wyont came to deliver groceries and Weightman said with an oath that Gentry had slept with one eye open all night. In the afternoon Mrs. Gentry and Mackey went to a picture show and returned to the Gentry home. Weightman was there, and these three discussed how they could kill Mr. Gentry and avoid apprehension. After which discussion they agreed to go downtown early in the evening, and Mrs. Gentry took her five year old boy to a nearby neighbor to stay all night. Then she and Mackey went downtown together, and Weightman followed later. Mrs. Gentry and Mackey went to the Ferris Hotel and registered as man and wife. After staying there 15 or 20 minutes they went to the post office, where they had agreed to meet Weightman. He soon appeared, slightly intoxicated, and Mrs. Gentry said, "Have you procured your room," and Weightman said, "No; I spent my money for whisky; if I have to do the killing I want to have some nerve." Then they agreed to go to the Gentry home. Mrs. Gentry and Weightman went together, and Mackey followed later. There they began to discuss how they should execute this murder. Both Mrs. Gentry and Weightman claimed the privilege, so they drew straws which Mrs. eGntry prepared to decide which should shoot Mr. Gentry, and Weightman drew the fatal straw. It was then agreed that it would be best for it to appear that the house had been burglarized, and they proceeded to ransack the trunks, dressers and other furniture, so that the place would have that appearance. To further cast suspicion from themselves, they agreed to make some eggnog and to stain two glasses, so that it would appear that two persons had been drinking eggnog there, and then Mrs. Gentry suggested that

perhaps it would be better to make it appear that Mr. Gentry was with a woman in his home that night, and she then rumpled the bed and put one of her back combs under the pillow of the bed, so that it would indicate that a woman had been in the house that night. It was then about 10 p. m. Shortly after, Mr. Gentry came home. When he entered the front door Mackey went out the back door. Mr. Gentry sat down in a rocking chair to read his paper, as was his custom, and Weightman, standing behind him, fired the fatal shot, the bullet entering the back of his head. When he heard the report of the gun, Mackey went into the house, and Mrs. Mackey remarked, "We had better get out of here as quick as possible." They went out the back door and went south a block or two, then east, then south, and at the corner of Third and Douglas streets Weightman threw the pistol under a culvert. By some means or other the gun fired as it was thrown under there. It was then about 11 o'clock, Saturday night, January 6th. The pistol was found there the next morning. From there the three went south to Western and Main, where they boarded a car returning to the terminal. Ollie Estes, a policeman, was on the car, and spoke to Mackey. Mrs. Gentry and Mackey went to their room at the Ferris Hotel, and Weightman followed 15 or 20 minutes later, and occupied an adjoining room. The next morning they went to a restaurant and got breakfast, and then Mrs. Gentry boarded a Linwood car, and arrived home about 9 o'clock Sunday morning, and gave the alarm that her husband had been murdered.

It is shown that upon her entrance to the home that morning she discovered the comb in the bed, and discovered that the diamond stud which her husband was accustomed to wear was gone. When friends of Mr. Gentry came she told them that she had stayed at her father's that night, but, when confronted with the positive evidence that the state could show her whereabouts that night, she stated to the officers that she and Mackey went downtown early in the evening to the Ferris Hotel, and from there to the picture shows, and then thy returned to the Ferris Hotel. It appears that Mrs. Gentry had her husband's

diamond in her possession at the Ferris Hotel on this night after the murder was committed.

The defendant Jess K. Mackey was granted immunity, and testified as a witness for the state.

The foregoing summarizes the testimony of 50 witnesses for the state.

For the defense, the defendant Maurice Weightman took the stand as a witness, and testified: That he was 18 years of age. That on the occasion he and Mackey left Wyont to go to the Gentry home Mackey asked to let him see the pistol, and he took it and put it in his pocket. When they got to Sixth and Western, Mackey stopped and said he was going to wait there until Gentry came home. That he asked him what he meant, and Mackey said: "I will get him here," and he said to him: "Not while you are with me you won't; you come on and go back to town with me," and they returned downtown. Then they went from the Rock Island depot to Mr. Gentry's place, witness expecting to get some money from Mr. Gentry. That there was no agreement in the presence of the plaintiff in error that they were to go to Mr. Gentry's place and there murder him. That he purchased arsenic at the Bethel Drug Store for Mackey. That he asked Mackey what he wanted it for, and Mackey said he wanted it to kill rats. That on the night of the murder, about 7 o'clock, he left the Gentry home with Mackey and Mrs. Gentry, and took a street car for downtown. That he got off the car at the corner of Main and Hudson. That about 9 o'clock he met Mackey at the White Way Pool Hall, and Mackey said, "We will go out to Gentry's and get some whisky," and they went out to the Gentry home, and climbed in the window, and Mackey made some eggnog, and they drank it. After they had been there about 20 minutes, Mr. Gentry came in and took his revolver out of his coat pocket and laid it on the table, and sat down in a chair with a newspaper in his hand, and said to Mackey, "Jess, what are you doing out here?" and Mackey said, "I come out here with Maurice," and Mr. Gentry said, "I want you to go away from here and stay away from here; I have found you out; I don't want you to come around here any more," and Mackey said, "Mr. Gentry, my overcoat is

there on the davenport; can I get it?" and Mr. Gentry said, "Yes; get it and get out of here." That witness was in the kitchen and heard a pistol shot. That he ran and asked Mackey, "What have you done?" and he said, "I have killed the son of b——h." That witness went out the back door and ran nearly all the way to his father's home, and there went to bed. That his father called him to answer the telephone, and Mackey said to him over the phone: "Come downtown right away; I want to see you. Come to the Ferris Hotel; come to room 2; Mrs. Gentry is here." That he went to the Ferris Hotel, and registered, and was assigned room 4. That Mackey came into the room and told him that Mrs. Gentry was in the adjoining room, and told him not to tell her anything about what had happened, and he promised Mackey he would not say anything about it. That Mackey told him that he had turned out all the drawers and scattered things around and took Mr. Gentry's diamond and threw it in the sewer. That Mrs. Gentry came into the room and asked, "What have you two kids been into?" That Mackey stayed with him in room No. 4.

The plaintiff in error, as a witness in her own behalf, denied any knowledge of the murder; testifying that on the evening of the murder, after leaving her home with Mackey and her brother, she went with Mackey to the Ferris Hotel, and he got a room, and they stayed there about 20 minutes; that they then walked to the post office and talked a while, and Mackey said he was going to the White Way Pool Hall, saying that he would see her at the Ferris Hotel at 9:30; that later she went to the hotel and went to the room, and then came downstairs, and then went to the Orpheum, and there met Zelma Tucker and Mrs. Tully. When the show was over these ladies went with her to the terminal. It was then about 11 o'clock. She then took a street car for home. When the street car reached Linwood and Braeur, she got off the car and started to walk home, and passed a man. As she passed him the man said, "Is that you, Bess?" and she said, "Yes," and stopped, and the man was Jess Mackey. He said, "Where are you going?" She said, "I am going home." He said, "Well, you come on back downtown with me." She said, "No; I am not

going to do it; you lied to me," and he said, "Yes; you come and go back with me; the gas is out; there is no light there; you will freeze to death; come and go back to the hotel with me," and finally she said, "All right," and they started down to the corner. She said, "Let's wait for the car," and he said, "No; come on, and let's go over and catch a Main street car." So they started down Brauer to Sixth street, and there turned and went one block east, and then south from there. When they had gone two or three blocks, she heard something like a pistol shot, and said, "What on earth was that?" and Mackey said, "You come on here; I know what I am doing; you come on and go with me." So they went to the corner of Grand and Hudson, and then went to the Ferris Hotel, and there Mackey telephoned to her brother Maurice, and in about half an hour her brother appeared. That she occupied room 4. She denied that she had ever threatened to kill her husband. Cross-examined: Did not know exactly how much lifei nsurance her husband had, $3,000 or $4,000, something like that, and she thought she was the beneficiary, and could not approximate the number of times she and Mackey were criminally intimate.

J. T. Weightman testified: That he was the father of Alverta B. Gentry and Maurice Weightman. That on the night of the 6th of January his son Maurice came home about half past 11 o'clock, and went to bed. About 15 minutes after he came in the phone rang, and witness answered. The questions were: "Is Maurice there; I want to speak to him?" Witness asked: "Who is this?" The answer was: "Jess Mackey." Then he called his son Maurice to the phone, and soon after his son Maurice left the house.

The case-made contains about 1,200 pages, but the foregoing statement of facts is sufficient for the purpose of this opinion.

*Moman Pruiett, Ben F. Williams, Selwyn Douglas, E. G. Wilson,* and *Victor A. Sniggs,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen. (*Sam Hooker,* of counsel), for the State.

DOYLE, P. J. (after stating the facts as above). Reviewing the assignments of error relied upon for a reversal of the judgment in their natural sequence, rather than in the order of their presentment in argument, the first question is: "Did the court err in refusing to grant a change of venue?" The application was supported by the affidavits of the plaintiff in error and 30 residents of Oklahoma county. The ground set up in the application was that the minds of the inhabitants of Oklahoma county are so prejudiced against the defendant that she cannot obtain a fair and impartial trial in said county. It was also averred in her affidavit that the deceased was very popular, and had an extensive acquaintance throughout the city and county, and was a prominent member of several fraternal societies, and was a thirty-second degree member of the Masonic order, and that the membership, as individuals of the Masonic order of the city and county, had become and are a strong and insurmountable influence in the city and county against the defendant; that certain newspapers published in Oklahoma City had published prejudicial accounts of the tragedy, and, as they had a large circulation in Oklahoma county, by reason of such publications the minds of the inhabitants of the county were prejudiced against the defendant. Said newspaper reports were attached to, and made a part of, the application.

The state, resisting the application, filed affidavits of the county attorney and his assistant, having personal charge of the prosecution, stating, in substance, that no member of the Masonic fraternity, or any other fraternity, had ever consulted them in any way concerning the case; also the affidavit of the clerk of the county court, showing that two of the defendant's supporting affiants had been convicted of violations of the prohibitory laws, and another had a similar charge pending in said court. There was also filed more than 100 affidavits of citizens of the county, each affiant stating that:

"In his opinion, there does not exist in the minds of the inhabitants of said county any bias or prejudice against said defendant, and that an unprejudiced, fair, and impartial jury can be obtained from the resident taxpayers of the county for

the trial of said cause, and that affiant is not a member of any Masonic fraternity or affiliated therewith."

The defendant filed a motion to strike from the files and records all controverting affidavits filed on the part of the state, on the ground that the same are not controverting affidavits within the meaning of the statute. Which motion was overruled. Thereupon the defendant filed a motion asking that a subpoena be issued for each of the persons who made said affidavits on behalf of the state, and that the court make an order requiring said persons to appear and testify in open court as to matters and things set out in their respective affidavits. Said motion was overruled.

Plaintiff in error contends that the court erred in denying the aforesaid motions.

We think that the motions were properly denied. The statute provides that a change of venue may be had in any criminal cause pending in the district court on the application of the defendant by petition setting forth facts verified by affidavit, and the truth of the allegations in such petition to be supported by the affidavits of at least three credible persons who reside in said county. It further provides that:

"The county attorney may introduce counter affidavits to show that the persons making the affidavits in support of the application are not credible persons and that the change is not necessary, and may examine the witnesses in support of said application in open court in regard to the truth of said application." (Section 5811, Rev. Laws 1910.)

Here there was no dispute in regard to the publication of the newspaper articles, but the question was whether these articles had produced a prejudice in the minds of the inhabitants of the county against the defendant. If they had, she would be entitled to a change of venue. If they had not, it was the duty of the court to deny the application.

The affidavits filed by the state in denial of the allegations of the petition tended to show that there was no such state of feeling generally prevailing throughout the county as would prevent the defendant from having a fair and impartial

trial therein, or would even make it difficult to obtain an impartial jury for the trial.

It has been the uniform holding of this court that the granting of a change of venue is, under the statute, a matter resting within the sound discretion of the trial court, and, unless it clearly appears that there is an abuse of such discretion, this court will not reverse the judgment for the failure of the trial court to grant a change of venue. Following the decisions in *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988, *Starr v. State,* 5 Okla. Cr. 440, 115 Pac. 356, *Watson v. State,* 9 Okla. Cr. 1, 130 Pac. 816, and *Tegeler v. State,* 9 Okla. Cr. 138, 130 Pac. 1164, we are of opinion that there was no error in refusing a change of venue.

The second question is: Did the court err in refusing to continue the case? One ground stated in the affidavit for a continuance is the absence of material witnesses, Elma A. Tucker, Mrs. J. A. Tully, Maud Tatum, and Sinna Thedford, without whose evidence it is alleged the defendant could not safely proceed to trial. The other portions of the affidavit of the plaintiff in error state, in substance, that said Elma A. Tucker was duly served with a subpoena, but said witness, without the knowledge and consent, connivance or procurement of this defendant, has departed to parts unknown; that she has been unable to ascertain the whereabouts of said Mrs. Tully; that said Maud Tatum lives on Live Oak street, Dallas, Tex., and said Sinna Thedford lives on Calhoun street, Ft. Worth, Tex.; that said witnesses, if present, would testify that they knew Mrs. Gentry, and they saw her about 9:30 p. m. on January 6, 1912, at the Ferris Hotel, and later at the Orpheum Theater, and were with her at the terminal station that evening at 10:45 p. m., while she was waiting for a Linwood car; that she employed detectives to try to locate said witnesses, and the evening before the case was called for trial was the first time her counsel was informed of the address of the two witnesses last named.

Another ground relied upon in the affidavit for continuance was that Ben F. Williams, one of her counsel, was absent at the bedside of his father, who was then dying in the city of Clinton, Okla., and that she had contracted and given all her property to the said Ben F. Williams and Moman Pruiett to obtain their services in her behalf; that the said Ben F. Williams was present at, and took an active part in, the preliminary trial. It appears from the record that Mr. Williams returned to Oklahoma City before the first witness was called by the state and appeared as counsel throughout the trial.

Continuances ought always to be granted when, from the showing, justice requires it to be done, and to enable the defendant to procure all legal and competent evidence necessary for a fair presentation of the defense, where due diligence to obtain the same has been shown.

In this case the murder was committed on January 6th, and the next day the defendants were arrested, and a preliminary examination was held. She and her counsel then knew as well what the plaintiff in error would be called upon to meet as they did when the information was filed in the district court on January 22d. The trial commenced on February 27th. Here was a period of 52 days from the time of her arrest, and 35 days after the information was filed, in which to prepare for trial.

The application shows an utter want of diligence to have the witnesses in attendance upon the trial, as well as a want of probable truth of the stated testimony. In reviewing the refusal of a continuance on account of absent witnesses, the record will be examined, and the evidence adduced at the trial will be considered by this court for the purpose of determining whether the alleged testimony was probably true. *McCarty v. State,* 10 Okla. Cr. 407, 136 Pac. 1122.

The record shows statements of the plaintiff in error made to witnesses Morris, Jones, Zwick, and Tilghman as to her whereabouts and her movements on the night of the tragedy, which conclusively show that she was not with the absent wit-

nesses at the time their alleged testimony would tend to establish. No affidavit of any of the alleged absent witnesses was presented in support of the motion for a new trial.

It is not an abuse of discretion to deny a continuance asked on the ground of absence of material witnesses, who were out of the state, where it is not shown that anyone of them would or could be procured within any reasonable time. If said witnesses had been present and testified to the facts stated in the affidavit for a continuance, we think the jury would not have given credence to such testimony in the face of the evidence produced on the trial.

It is our opinion that the court did not err in overruling the application for a continuance.

The third question is: Did the court err in refusing to sustain the defendant's challenges for cause to Jurors J. W. Morgan and Albert Pressley?

From the examination of the Juror Morgan it appeared that he had not talked with any one who purported to know about the case of his own knowledge, but had read full accounts of the tragedy in the newspapers, but had no fixed opinion at this time in reference to the guilt or innocence of the defendant of the charge against her, and that he believed that he could act as a fair and impartial juror in the trial of the case. His examination by the defendant's counsel is as follows:

"Q. Now, at the time you read these published articles, did you form any opinion as to the guilt or innocence of this defendant? A. Yes, sir; from the newspaper articles. Q. Certainly; that opinion was based upon the purported confessions and statements and things that you read in the paper? A. Yes, sir. Q. Do you still have that opinion? A. I would in the absence of any testimony to disprove it; yes, sir; or any statement, rather. Q. It would require sworn testimony to remove that opinion? A. Well, I don't know; a statement might do it just as well as the sworn— I understand the statement in the newspaper is not sworn testimony; it is only newspaper opinion. Q. Certainly; but that caused you to form an opinion, didn't it? A. Yes, sir. Q. And you still have that opinion? A. Yes, sir. Q. Now, you say the only way you can get rid of that opinion is by evidence here in court; is that true? A. Yes, sir;

I think so. Q. Suppose no evidence is offered as to a fact which you have read of and upon which you base an opinion; then you would retain that opinion, wouldn't you? A. No, sir; I wouldn't. Q. How would you get rid of it, Mr. Juror? A. If there was any testimony, I would be governed by the testimony strictly. Q. Do you belong to any secret organization? A. I do. Q. What organization is it? A. I belong to the Masonic order, the Odd Fellows, and the Woodmen, and some others. Q. Where is your membership in the Masonic order? A. Luther, Okla. Q. You learned from what you read in the paper that the deceased was a brother Mason, didn't you? A. Yes, sir. Q. You have an opinion now that he was a Mason, haven't you? A. Yes, sir. Mr. Pruiett: We now challenge the juror for cause. Mr. Zwick: The state resists the challenge. The Court: Mr. Morgan, would the fact that the deceased in this case was a Mason have a tendency to affect your mind in any way in determining your verdict in this case? A. I don't see why it would. Q. Well, answer me then directly? A. I don't think so. Q. Notwithstanding any opinion you may have formed from reading the newspapers, could you lay such an opinion or opinions aside, and try the case fairly under the law and the evidence? A. Yes, sir. Q. And give the defendant an impartial trial? A. Yes, sir. Q. Those opinions or any of those things upon which you based these opinions you wouldn't permit to enter into your consideration at all? A. I would not. Q. Is that your state of mind? A. Yes, sir. Q. And I understood you during the course of your examination to state that, if there were some matter that you had formed an opinion upon, but it was not supported by the evidence, you would not consider that as a fact at all. A. No, sir. You mean the statements in the paper? Q. Yes, sir. A. No, sir. Q. You would only fix as facts such things as are proven on the trial? A. In the court. Q. Is that your state of mind? A. Yes, sir. The Court: The challenge is overruled. Exception allowed."

On the examination of the juror Albert Pressley it appeared that this juryman had not talked with any one who purported to know about the case of his own knowledge, but had read full accounts of the tragedy in the newspapers; that he had no opinion other than that derived from reading the newspapers; that he was positive that he could disregard that opinion and try the case solely under the evidence as presented. On cross-examination he stated:

"Q. In your present frame of mind, with what you have read, you could convict the defendant on less evidence than if you had not heard anything, couldn't you? A. I don't think I would. Q. You would carry that opinion into the jury box with you, wouldn't you? A. Yes, sir. Q. Having that opinion, would it require greater evidence upon the part of the defendant for you to acquit her than it would if you did not have that opinion? A. I don't think it would. Q. Isn't it a fact, Mr. Pressley, that you have expressed that opinion to one of your neighbors? A. Well, I have talked but very little about it. Q. Isn't it a fact that you expressed that opinion? A. Yes, sir; I have. Mr. Pruiett: The defendant challenges Mr. Pressley for cause. The Court: You say that you have an opinion as to the guilt or innocence of this defendant? A. Yes, sir. Q. Is that opinion based upon what purported to be any of the testimony in the case or merely upon newspaper reports? A. Well, just what I got out of the newspapers. Q. It is based solely upon what you read in the newspapers? A. Yes, sir. Q. Notwithstanding such an opinion, could you try the case fairly and impartially under the law, and give the defendant a fair and impartial trial? A. Yes, sir. Q. Would you convict the defendant upon any less testimony by reason of this opinion or the things that you have read, upon which you have formed your opinion, than you would if you had not read those articles in the newspapers? A. No, sir. Q. You would still require the state to prove the defendant guilty by the evidence beyond a reasonable doubt before you would consent to a conviction? A. Yes, sir. Q. Could you lay aside this opinion which you say you have formed upon newspaper reports entirely, and not give that any weight or consideration in determining your verdict? A. Yes, sir. Q. You think you would not permit these reports or any opinion you may have formed based thereon to enter into your considerations in determining your verdict? A. No, sir; I would not. Q. You think you would not permit them to enter into your considerations at all; is that a fact? A. Yes, sir. Q. Then I understand you that in the reading of these newspaper reports any opinion based upon them would not affect your mind one way or the other in determining your verdict in the case? A. No, sir; it would not. Q. Your verdict would be based entirely on the evidence you hear upon the trial, and the law given to you by the court; is that correct? A. Yes, sir. Mr. Pruiett: Counsel for the defendant wants to object to the questions propounded by the court to the juror, as being leading and

prejudicial to the rights of the defendant. The Court: Overruled. The challenge overruled also. Exceptions allowed."

The defendant exhausted her right of peremptory challenge without excusing said jurors. The question presented is: What shall be deemed a disqualifying opinion?

Our Procedure Criminal provides that:

"No person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon rumor, statements in public journals, or common notoriety, provided it appears to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him." (Section 5861, Rev. Laws 1910.)

The increased facilities, through the press, of spreading stories of crime, as items of news, especially among the more intelligent classes, makes it difficult to lay down a fixed rule which would disqualify persons who formed their opinions from newspaper reports, or common report and rumor, unless it be of that character which impairs the impartiality of the juror by engendering a bias or prejudice which is fixed, and would require evidence to remove. Under the provisions of the statute the competency of a juror is a question of fact to be determined by the court. Before the court can so determine, it must be shown by an examination of the juror, upon his *voir dire,* not only that his opinion was formed solely in the manner stated, but, in addition to this, the juror must swear unequivocally that he feels able, notwithstanding such opinion, to render an impartial verdict upon the law and the evidence.

In the case of *Turner v. State,* 4 Okla. Cr. 164, 111 Pac. 988, it is said:

"One accused of crime is by the Constitution guaranteed a fair and impartial trial (Const. Bill of Rights, sec. 20), but, to insure this, it is not meant that jurors shall never have heard of the case, or shall not have any impressions, concerning any of the facts. In this day and age it would be difficult to find citizens competent for jury service who have not some impression as to the case, derived from newspaper accounts. The constitutional guaranty only excludes those jurors who have an opinion

upon the merits of the case, upon the guilt or innocence of the accused of the crime charged, based upon such testimony as may reasonably be expected to be presented upon the trial, or an opinion founded on personal ill will towards the accused. * * * Under the statute an opinion formed or expressed as to the guilt or innocence of the defendant founded upon rumor or newspaper reports does not disqualify a juror, provided it appears to the court, upon the declaration of said juror, he can and will, notwithstanding such opinion, act impartially and fairly upon the law and evidence. As we construe the statute, the competency of a juror is a question of fact to be determined by the court in the exercise of a sound discretion, and constitutes a legislative definition of the constitutional provision. However, it cannot be regarded as changing in any degree the essential qualifications which jurors must possess. It merely furnishes a test by which those qualifications are to be determined. It makes the declaration of the juror 'that he can and will, notwithstanding such opinion, act impartially and fairly upon the matters to be submitted to him, competent, as bearing upon the question of his impartiality, and requires the court to consider such declaration, when so made.' The statute does not attempt to determine what shall be the probative force of the declaration of the juror, or how far it shall have the effect of relieving him on the disqualification arising from such an opinion. The declaration, when so made, is evidence to be received and gives such weight as, under all circumstances appearing, it is fairly and justly entitled to. Before it can operate to remove the disqualification, the court must be satisfied of its truth, and that question is left to be determined from all the facts and circumstances appearing from his examination upon the *voir dire.*"

An examination of the testimony of these jurors, given on *voir dire,* shows conclusively that the opinions which they formed, and that one juror says he may have expressed, were founded upon the reports which they had read in the newspapers. Intelligent men take newspaper accounts as current news, liable to qualification, explanation, or contradiction, and, when qualified, explained, or contradicted, they change their opinions or belief accordingly as a matter of course. The opinions of the jurors here were such opinions merely as intelligent men almost irresistibly form from reading newspaper accounts of crime, relying upon the truthfulness of the published accounts, which

are always subject to be changed and altered by contradictory accounts. Such opinions rarely disqualify intelligent men from fairly considering the evidence given on a trial and rendering an impartial verdict thereon when called upon to act as jurors. Nine-tenths of the intelligent taxpayers of the county, where a homicide has taken place, and the facts and the circumstances attending it have been published in the newspapers, would be disqualified as jurors, if the objections raised in this case were well founded. All of them would read the accounts or hear the facts detailed by some one who had read them, and most of them would form just such opinions, or get just such impressions as the jurors had in this case.

Under our statute, the mere expression of an opinion by a juror in common conversation, without anything to show ill will, hostility, or a fixed determination of belief, is not a legal ground of challenge for cause. In order to disqualify the juror there must be "the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging." Section 5858, Rev. Laws 1910.

The issue raised upon a challenge for cause to a juror in a criminal case, on the ground that he has formed an opinion founded upon rumor, statements in public journals, or common notoriety, and upon which he has expressed an opinion, is one of mixed law and fact; and the finding of the trial court upon the issue ought not to be set aside by a reviewing court, unless it appears that upon the evidence the trial court ought to have found that the juror had formed such an opinion that he could not in law be deemed impartial. *Ex parte Spies,* 123 U. S. 131, 8 Sup. Ct. 22, 31 L. Ed. 80; *Holt v. U. S.,* 218 U. S. 245, 31 Sup. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138.

In the case at bar we are clearly satisfied that the opinions of the jurors challenged for cause were not of a disqualifying character.

Exceptions to the refusal of the court to give certain instructions requested by the defendant are called to our atten-

tion and urged as error in the plaintiff in error's brief. An examination of the charge of the court shows that the jury was fully and correctly instructed upon every phase of the case. The instructions requested and refused were cautionary, touching the credibility of certain witnesses and the weight to be given to their testimony. They were properly refused. The court correctly stated the statutory rule as to the necessity of corroboration of the testimony of an accomplice by giving the following instruction:

"The witness Jess K. Mackey, having testified to being concerned in the commission of the crime charged in this case, is termed in law an accomplice; and you are instructed that a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant on trial with the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. If you find that the testimony of the witness Mackey has been corroborated by other evidence tending to connect the defendant Alverta B. Gentry with the commission of the crime charged, then you would be warranted in convicting the defendant, if all the evidence, taken together, convinces you beyond a reasonable doubt of her guilt. The corroborative evidence connecting her with the crime need not be sufficient, standing alone, to convince you of her guilt, but, if the corroborative evidence, together with the testimony of the accomplice, convinces you beyond a reasonable doubt of her guilt, then you should so find your verdict."

A careful examination of the record fails to disclose any errors whereby the substantial rights of the plaintiff in error have been prejudiced. Her trial was eminently fair, and she was ably defended. In our opinion, the evidence amply supports the verdict. The crime, as the evidence tends to establish it, was of a peculiarly brutal and heartless character, and it would have been a miscarriage of justice, as we think, if upon the evidence in the case any other verdict had been rendered.

The judgment of the district court of Oklahoma county herein is therefore affirmed.

FURMAN and ARMSTRONG, JJ., concur.